J.M. PRODUCTS, INC. *v.*
ARKANSAS CAPITAL CORPORATION

CA 94-1039                                    910 S.W.2d 702

Court of Appeals of Arkansas
Division II
Opinion delivered December 6, 1995

*Mays & Crutcher, P.A.*, by: *Richard L. Mays* and *Michael A. LeBoeuf*, for appellant.

*Rose Law Firm*, by: *Stephen N. Joiner*, for appellee.

JOHN MAUZY PITTMAN, Judge. This appeal is from a summary

judgment that granted appellee a mandatory injunction requiring appellant, J.M. Products, Inc., to issue a stock certificate for 250 of its shares to appellee. In contending that the trial court erred in awarding summary judgment, appellant asserts that a number of questions of fact remained for the trial court's determination. We find no merit to any of its arguments and affirm.

In March 1990, defendant Anthony Riney pledged a stock certificate for 250 shares of stock in J.M. Products, Inc., to appellee as collateral for a $100,000.00 loan. Appellee made the loan to defendant R.J. Productions, Inc., a corporation solely owned by Riney, and the loan was personally guaranteed by Riney and his wife, Helen Riney. After R.J. Productions, Inc., and the Rineys defaulted on their payments under the note, appellee requested appellant to reissue the stock certificate in appellee's name. Appellant, however, refused, claiming that the Pulaski County Circuit Court, in *Riney* v. *J.M. Products, Inc.*, No. 90-5273 (Sept. 5, 1991), had found that Riney improperly obtained the stock certificate. Appellee was not a party to that lawsuit.

Appellee then filed suit against R.J. Productions, Inc., the Rineys, and appellant, seeking judgment jointly and severally in the amount of $102,501.00 together with attorney's fees. It also requested the court to declare it to have a first lien against the collateral described in the complaint, to grant it possession of such collateral, and to order appellant by mandatory injunction to issue a stock certificate in the name of appellee representing ownership of 250 shares of stock of J.M. Products, Inc. Appellee attached to its complaint the loan agreement between appellee and appellant, the promissory note for $100,000.00, the guaranty agreement signed by the Rineys individually, the stock pledge and security agreement, the stock power transferring the stock certificate to appellee's name, and a copy of the stock certificate representing 250 shares of common stock made out in favor of Anthony Riney, dated April 16, 1982, and bearing the signatures of Ernest P. Joshua as president of appellant and Thelma L. Joshua as secretary thereof.

In the pleadings and depositions filed with the court, appellant admitted the validity of the signatures on the stock certificate. Appellant also admitted that it received a letter dated March 20, 1990, from appellee's attorney, requesting that the

corporate stock records of appellant be amended to reflect the Stock Pledge, Security Agreement, and Stock Power executed by Tony Riney and Helene Charlot Riney to appellee. On April 19, 1990, appellant responded, advising appellee that appellant had the first right to purchase the common stock of Mr. Tony Riney should R.J. Productions, Inc., or Mr. Riney default on any of the terms or provisions of their loan agreement with appellee and that it be given immediate notification if such default occurs. Appellant's response made no mention of its claim that Riney had wrongfully obtained the stock certificate. Appellant also admitted that it had no communication of any kind with appellee concerning the status of the stock certificate prior to March 6, 1990; that its president, Ernest P. Joshua, testified in Pulaski County Circuit Court Case No. 90-5273, *Riney* v. *J.M. Products, Inc.*; that he "told the Board that [Riney] owned Twenty Five Percent of [appellant] in 1990"; and that appellant had not filed suit against Riney until October 17, 1990.

Based on these pleadings and appellant's admissions, appellee moved for summary judgment. Attached to its motion were the affidavits of Sam Walls and George Eagen, executive vice presidents of appellee. Walls' affidavit stated:

> Based on a diligent review of ACC's books and records, Defendants, R.J. Productions, Inc., as primary obligor and Anthony Riney and Helene Charlot Riney as guarantors, are currently indebted to ACC, as of July 26, 1993, in the amount of $105,129.27, with interest accruing per diem at the rate of $30.21. A true and correct copy of the loan payment record is attached hereto as Exhibit "1".

Eagen's affidavit stated:

> 2.   At no time during the loan evaluation process and prior to closing was I made aware of any deficiency in the validity of the stock in J.M. Products, Inc. that was pledged by Anthony Riney as partial collateral for the loan from ACC to R.J. Productions, Inc.

> 3.   Mr. Riney represented himself as an officer of J.M. Products. Mr. Riney had copies of audited financial statements of J.M. Products, a closely held corporation, supporting the contention that he was in fact a shareholder.

Appellee was granted summary judgment against separate defendant R.J. Productions, Inc., in the amount of $124,913.64. Appellee was later awarded summary judgment against appellant, J.M. Products., Inc. In that judgment, the chancellor found that the affidavit of George H. Eagen of appellee made a prima facie showing that appellee was a subsequent purchaser for value of the Stock Certificate, that appellee had no knowledge of any defect with respect to the Stock Certificate at the time that it was pledged by Riney, and that the affidavit of Ernest P. Joshua of J.M. Products did not contain any factual assertions negating appellee's prima facie showing of appellee's status as a purchaser for value of the Stock Certificate or appellee's prima facie showing that it had no knowledge of any defect with respect to the Stock Certificate at the time the Stock Certificate was pledged to appellee. The chancellor concluded that, under Ark. Code Ann. § 4-8-202(2) (Repl. 1991), appellee is entitled to and is the lawful owner of 250 shares of the common stock of appellant, and that appellee is entitled to a stock certificate evidencing such ownership and all the attendant rights of being a stockholder of appellant. The judgment ordered appellant to issue a stock certificate in appellee's name on or before June 10, 1994.

Motions for summary judgment are governed by Rule 56 of the Arkansas Rules of Civil Procedure, which provides that a judgment may be entered if the pleadings, depositions, answers, interrogatories, and admissions on file, in addition to affidavits, if any, show that there is no genuine issue as to a material fact and the moving party is entitled to judgment as a matter of law. Summary judgment is an extreme remedy which should be allowed only when it is clear that there is no genuine issue of fact and the moving party is entitled to a judgment as a matter of law. Although affidavits and documents in support of motions for summary judgment are construed against the moving party, once a prima facie showing of entitlement to summary judgment is made, the responding party must discard the shielding cloak of formal allegations and meet proof with proof by showing a genuine issue as to a material fact. *Mathews* v. *Garner*, 25 Ark. App. 27, 751 S.W.2d 359 (1988).

For its appeal, appellant argues that summary judgment was in error because questions of fact existed for the trial court's determination. Appellant first argues that the trial court should

not have considered the affidavit of George Eagen in awarding appellee summary judgment because the trial court did not have the opportunity to assess Eagen's credibility. Appellant, however, has not cited any authority for this argument, nor do we know of any.

Appellant next claims that the trial court erred in finding that appellee was a bona fide purchaser without notice of appellant's claim. Arkansas Code Annotated § 4-8-302(1) (Repl. 1991) states that "[a] 'bona fide purchaser' is a purchaser for value in good faith and without notice of any adverse claim . . . ." The burden was on appellee to prove that it was a bona fide purchaser. *See Gwatney* v. *Allied Companies, Inc. of Arkansas*, 238 Ark. 962, 385 S.W.2d 940 (1965).

The evidence attached to appellee's motion demonstrated that Riney had possession of the stock certificate when it was given to appellee, that there was nothing on the face of the certificate to give appellee notice that it was invalid, that the signatures on the certificate were valid, and that Riney had copies of the audited financial statements of appellant supporting his claim that he was a shareholder. Based on this evidence, the trial court found that appellee made a prima facie case that it was a bona fide purchaser for value in good faith and without notice of appellant's claim. It also found that appellant failed to rebut appellee's case with any evidence.

Appellant refutes this finding and contends that appellee had constructive notice of appellant's defense to the stock certificate and, therefore, whether appellee was without notice of appellant's adverse claim was a question of fact. The evidence on which appellant relies for its argument is the affidavit of its president, Ernest Joshua, which states: "[Appellee] had knowledge of the litigation between J.M. and Riney concerning Riney's ownership of J.M. stock but did not intervene in the litigation." Assuming that Joshua's statement is true, appellant still has not presented any evidence of appellee's knowledge at the time it accepted the stock certificate as collateral. The litigation to which Joshua refers in his affidavit did not occur until seven months after appellee accepted the certificate as collateral.

Appellant also argues that appellee failed to make any effort to establish the validity of the stock certificate prior to accept-

ing it as collateral and, therefore, appellee's failure to make such an effort operated as knowledge of appellant's defense as defined by Ark. Code Ann. § 4-1-201(25)(c) and (27) (Supp. 1993), which provides:

> (25) A person has notice of a fact when:

> (c) From all the facts and circumstances known to him at the time in question he has reason to know that it exists.

> . . . .

> (27) Notice, knowledge, or a notice of notification received by an organization is effective for a particular transaction from the time when it is brought to the attention of the individual conducting that transaction, and in any event from the time when it would have been brought to his attention if the organization had exercised due diligence. An organization exercises due diligence if it maintains reasonable routines for communicating significant information to the person conducting the transaction and there is reasonable compliance with the routines. Due diligence does not require an individual acting for the organization to communicate information unless such communication is part of his regular duties or unless he has reason to know of the transaction and that the transaction would be materially affected by the information.

In support of its argument that appellee had a duty to ascertain the validity of the stock certificate prior to accepting it as collateral, appellant cites *First National Bank of Cicero* v. *Lewco Securities Corp.*, 860 F.2d 1407 (7th Cir. 1988); *Hollywood National Bank* v. *International Business Machine Corp.*, 38 Cal. App. 3d 607, 113 Cal. Rptr. 494 (1974); and *Insurance Co. of N. Am.* v. *United States*, 561 F. Supp. 106 (E.D. Pa. 1983). We find that these cases are distinguishable from the case at bar and lend no support to appellant's arguments.

In *First National Bank of Cicero, supra,* the appellant, who alleged it was a bona fide purchaser, admitted that its agent had not contacted the securities information center as was its normal practice to determine whether the securities were stolen. The district court held:

> Under sections 1-201(25) and 8-302, a purchaser of securities will be charged with notice of those adverse claims which were discoverable through adherence to reasonable commercial standards of business conduct. In the present case, compliance with federal regulations *requiring* the verification of collateral is necessary to support a finding that a bank satisfied reasonable commercial standards.

*First National Bank of Cicero* v. *Lewco Securities Corp.*, 860 F.2d at 1413-14. In the case at bar, appellant has not cited any regulation that required appellee to check the validity of the stock certificate with appellant.

■ In *Hollywood National Bank* v. *International Business Machine Corp.*, 113 Cal. Rptr. at 498-99, the court held that, where no attempt was made to reconcile the transferee's prior credit record with his possession of a $70,000.00 stock certificate, the circumstances amounted to more than "mere suspicion" and were sufficient to place appellant on notice. The court held that mere knowledge of facts sufficient to put a prudent man on inquiry, without actual knowledge, or mere suspicion of an infirmity or defect of title, would not preclude a transferee from occupying the position of a holder in due course, unless the circumstances or suspicions were so cogent and obvious that to remain passive would amount to bad faith. Here, appellant has not come forward with any evidence that should have made appellee suspicious of Riney's possession of the stock certificate.

*Insurance Company of North America* v. *United States, supra*, concerned the appellant's subrogor's failure to follow several industry practices in the subject transaction. No such practices exist in the case at bar.

■ Appellant also argues that appellee would have discovered that Riney was not a stockholder of appellant if it had investigated the filings in the Secretary of State's office. Appellant produced a copy of its amended articles of incorporation filed with the Secretary of State on April 5, 1983, which showed there were 800 shares of outstanding stock owned by the Joshuas. Appellant, however, did not produce any evidence to show that it would have been a reasonable business practice for appellee to have checked these filings to look for this evidence. Arkansas law does not require a corporation to file the names of its stock-

holders with the Secretary of State's office. *See* Ark. Code Ann. § 4-26-202 (Repl. 1991).

Furthermore, appellant's December 31, 1988, audited financial records upon which appellee relied in accepting appellant's stock certificate as collateral shows that 1,050 shares of stock were outstanding. Appellant also admitted in response to appellee's request for admission that its president, Ernest Joshua, told "the Board [Riney] owned Twenty Five Percent of [appellant] in 1990."

Appellant's argument here is similar to the argument rejected by the supreme court in *Byrd* v. *Security Bank*, 250 Ark. 214, 464 S.W.2d 578 (1971):

> Appellants say that if the Security Bank had checked in the office of the Circuit Court Clerk, it would have found that the Kennett Bank had filed financing statements from appellants as security, said statements covering substantially the same property which had been covered in the financial statements securing appellee's indebtedness; that appellee would accordingly have been put on notice that "something was wrong". We disagree. The evidence reflects that appellee did not learn until June that Parsons had released the financing statements, and that Kennett had a lien on the properties. The Kennett financing statements were not filed until March 30, and it will be recalled that the Security financing statements had been filed in January. Appellee could not possibly have known about the latter filing unless it checked the clerk's records each day, week, or month to determine if the original financing statements were still in effect. Under the circumstances of this case, we cannot see where there was any duty on appellee to go over and check the records regularly to see if it still held effective security. There simply wasn't any reason for this to be done. Of course, this litigation could not have arisen except for appellants signing blank notes. The one fact that contributed most to the situation in which appellants now find themselves, is that they imprudently signed these blank instruments, and in doing so, failed to act as prudent persons.

*Id.* at 218, 464 S.W.2d at 580.

■ Appellant for its third point argues that appellee also had constructive notice by way of the "staleness" of its claim. For this proposition, it cites Ark. Code Ann. § 4-8-305 (Repl. 1991), which provides:

> An act or event that creates a right to immediate performance of the principal obligation represented by a certificated security or sets a date on or after which a certificated security is to be presented or surrendered for redemption or exchange does not itself constitute any notice of adverse claims except in the case of a transfer:
>
> (a) After one (1) year from any date set for presentment or surrender for redemption or exchange; or
>
> (b) After six (6) months from any date set for payment of money against presentation or surrender of the security if funds are available for payment on that date.

Appellant's argument, however, does not demonstrate how this section is applicable to Riney's stock certificate except to state that appellee's "claims should have been made not more than six months after default." It appears from the undisputed evidence that appellee did bring its claim within six months of Riney's default. According to appellee's complaint, R.J. Productions, Inc., made payments on appellant's note until October 22, 1992. Under the terms of the loan agreement, the borrowers had thirty days to remedy any default. Therefore, the lawsuit filed by appellee on May 6, 1993, was made within six months.

■ Appellant also contends that appellee did not prove that it was a "purchaser for value," which it was required to prove in order to be a bona fide purchaser under section 4-8-302. Appellant admitted in its answer to appellee's complaint that, "on March 6, 1990, Anthony Riney pledged the Stock Certificate to [appellee] as collateral for a loan from [appellee] to R.J. Productions, a corporation in which Anthony Riney and his wife, Helene Charlot, are the sole shareholders." This undisputed evidence was sufficient to show appellee was a purchaser for value. *See* Ark. Code Ann. § 4-1-201(44)(a) (Supp. 1993).

■ Also under this point, appellant argues that appellee should not be allowed to be unjustly enriched at the expense of appellant, even if appellee is a bona fide purchaser. We do not

address this argument because appellant has failed to produce any evidence to show that appellee has been unjustly enriched. Furthermore, the summary judgment awarded appellee by the court specifically provides:

> [Appellee] shall deal with such J.M. Products stock in accordance with the rights of a secured party under the Uniform Commercial Code with the proceeds if any applied to the judgment, costs, and attorney's fees awarded to [appellee] against R.J. Productions, Inc., in this proceeding with any remaining proceeds, after payment in full to [appellee], placed into escrow account for further determination by the court of any other party's interest in said proceeds.

Appellant also argues that Ark. Code Ann. § 4-9-112 (Repl. 1991) required appellee to notify appellant of the status of the collateral, which it contends appellee never did. We disagree. Appellee wrote appellant on two occasions, notifying appellant it held the stock certificate as collateral. Appellant responded to appellee's March 1990 letter but wrote nothing to indicate its adverse claim or to put appellee on notice that Riney was not the owner of the certificate. On January 21, 1992, appellee again wrote appellant regarding the stock certificate, stating:

> This letter is to remind your clients; J.M. Products, Inc., Ernest P. Joshua and Thelma L. Joshua; that Arkansas Capital Corporation ("ACC") has relied and continues to rely on the validity of the Stock Certificate attached hereto. As your clients know, ACC received the Stock Certificate as collateral for a $100,000 loan to R.J. Productions, Inc.

> R.J. Productions' debt to ACC has not been accelerated at this time. However, ACC continues to rely on the attached Stock Certificate as the primary collateral for the repayment of R.J. Productions' loan. Your clients should conduct their affairs accordingly until such time as R.J. Productions' debt is repaid in full.

There is no evidence that appellant responded to the letter.

Appellant's final point concerns its contention that the events at issue violate Article XII, Section 8, of the Arkansas Constitution. This section provides:

No private corporation shall issue stocks or bonds, except for money or property actually received or labor done, and all fictitious increase of stock or indebtedness shall be void; nor shall the stock or bonded indebtedness of any private corporation be increased, except in pursuance of general laws, nor until the consent of the persons holding the larger amount in value of stock shall be obtained at a meeting held after notice given for a period not less than sixty days, in pursuance of law.

Appellant argues that, although the stock was exchanged for value, it did not receive the value, and, therefore, the transaction runs afoul of Article XII, Section 8. We do not agree.

In *Gwatney* v. *Allied Companies, Inc.*, 238 Ark. 962, 385 S.W.2d 940 (1965), the supreme court held that, if one is a bona fide purchaser for value of stock certificates, then the certificates cannot be canceled and a corporation cannot claim the invalidity of the original issue of a stock certificate as against a person who, subsequent to the original issue, acquired the stock as a bona fide holder. The court in *Gwatney* relied on *Park* v. *Bank of Lockesburg*, 178 Ark. 669, 11 S.W.2d 483 (1928). There, the court held that one who in good faith lent money represented by a note and took the stock certificate as collateral, which was regular in form and carried no notice of any infirmity upon its face, was entitled to enforce its lien as against the claim of the bank for the purchase money of the stock. Appellant argues that *Park* v. *Bank of Lockesburg* is not controlling in the case at bar because the bank had some responsibility in the outcome as the stock certificate issued by the bank carried no notice whatever of any infirmity on its face. This same argument, however, can be made of appellant. This lawsuit could have been avoided if appellant's officers had not signed the certificate.

Appellant also argues that the stock certificate was not a "security" under Ark. Code Ann. § 4-8-101 *et seq.* (Repl. 1991). Section 4-8-102(1)(a)(i) provides that: "[a] "certificated security" is a share, participation, or other interest in property of or an enterprise of the issuer or an obligation of the issuer which is . . . [r]epresented by an instrument issued in bearer or registered form . . . ." Appellant argues that, in order to be a "security" as defined by Sections 4-8-102(1)(a)(i) *et seq.*, the stock

certificate had to be "issued," and the undisputed evidence here proved that the stock certificate in question was never issued.

In support of its argument, appellant cites *Bankhaus Hermann Lampe KG* v. *Mercantile-Safe Deposit and Trust Co.*, 466 F. Supp. 1133 (S.D.N.Y. 1979), where the court ruled that, since the certificates were stolen en route from the engraver to the issuer and subsequently forged, they could not meet Article 8's definition of securities. In doing so, the district court held that a stock certificate that has never been issued as defined by section 3-102(a) of the Uniform Commercial Code is not a security covered by Article 8. Section 4-3-105 states that "issue means the delivery of an instrument by the maker or drawer, whether to a holder or nonholder, for the purpose of giving rights on the instrument to any person."

Here, appellant concludes that, because the stock certificate in question was never delivered by appellant to Riney, the certificate is not a security and appellee cannot be a bona fide purchaser. We disagree that the district court's opinion in *Bankhaus* controls the situation at bar. In that case, the "securities" at issue were blank certificates stolen en route from the engraver to the issuer. Here, the stock certificate in question that was received by the appellee provided:

> This certifies that *Anthony Riney* is the owner of *Two Hundred and Fifty* Shares of the Capital Stock of . . . transferable only on the books of the Corporation by the holder hereof in person or by Attorney upon surrender of this Certificate properly endorsed. In witness whereof the said Corporation has caused this Certificate to be signed by its duly authorized officers and to be sealed with the Seal of the Corporation.

The certificate in question was originally in the hands of the issuer, appellant, where it was dated April 16, 1982, signed by Ernest P. Joshua as president and Thelma L. Joshua as secretary, and stamped with the seal of the corporation.

We do not find the fact that appellant did not physically deliver the stock certificate to Riney controlling as to whether the stock certificate was a "security" in appellee's possession. In *First American National Bank* v. *Christian Foundation Life*

*Insurance Co.*, 242 Ark. 678, 408 S.W.2d 912 (1967), the appellee questioned the validity of certain bearer bonds that were ostensibly issued by the First Methodist Church. The evidence reflected that the church's agent had duplicate bonds printed that he gave to the appellant for collateral. The appellee attempted to dishonor the bonds because they were fraudulently issued, but the appellant claimed it was a good faith purchaser for value. The court stated that there was no good basis for questioning the appellant's standing as a good faith purchaser for value as the term is defined in the Uniform Commercial Code. In that case, the supreme court stated:

> We think the chancellor should have found all bonds held by bona fide purchasers to be binding obligations of the church. It is plain enough that the church was careless in entrusting its treasurer's facsimile signature to Institutional Finance and in failing to take the precaution of requiring authentication of the bonds by a manual signature. By contrast, the holders of the bonds acquired then in the ordinary course of business and in circumstances entitling them to the protection afforded to bona fide purchasers.

> The case is controlled by the pertinent provisions of the Uniform Commercial Code. Before the adoption of the Code the church might have been held liable by contract to one purchaser and in damages to the other, but the draftsmen of the Code point out in their Comment to our 85-8-202 that the Code simply validates most defective securities in the hands of innocent purchasers, refusing to prefer one such purchaser over another.

242 Ark. at 682, 420 S.W.2d at 914-15.

Furthermore, Ark. Code Ann. § 4-8-202(4) (Repl. 1991) provides that "[a]ll other defenses of the issuer of a certificated or uncertificated security, *including nondelivery* and conditional delivery of a certificated security, are ineffective against a purchaser for value who has taken without notice of the particular defense." (Emphasis added.)

In conclusion, we agree with the court's holding that appellee made a prima facie case that it was a bona fide purchaser and that it did not have any knowledge of appellant's

adverse claim. The burden then shifted to appellant to rebut appellee's evidence, and it failed to do so. None of the exhibits or statements made in its affidavits were controverted by appellant, nor did appellant present any evidence to create a question of fact as to whether appellee knew of any wrongful taking at the time it received the stock certificate as collateral.

Affirmed.

JENNINGS, C.J., and COOPER, J., agree.